JUSTICE TRIEWEILER
dissenting.
¶33 I dissent from the majority’s conclusion that the District Court correctly granted summary judgment to the defendant in this case.
¶34 While the majority’s recitation of the facts might suffice as a closing argument to the jury on behalf of the defendant, in terms of this Court’s responsibility, which is to construe the record most favorably to the party opposing summary judgment, it is completely inadequate.
¶35 Although I would concede that there are facts from which persuasive jury argument can be made by the defendant, let me, consistent with the proper nature of our review, point out those facts which are most favorable to the party who opposed summary judgment.
¶36 The issue in this case is simply whether it can be concluded as a matter of law when Kaeding knew or should have known that he had asbestosis which was causally related to his employment at W.R. Grace & Co., or whether the date on which he would have, with due diligence, discovered his condition, is a question of fact. Only two witnesses testified in this case — the plaintiff, Donald Kaeding, and Alan Whitehouse, M.D., the physician who ultimately diagnosed Kaeding’s condition.
¶37 Kaeding had been diagnosed with heart failure as far back as 1968, and was disabled since 1970 from a combination of heart problems, thyroid toxicity, and other conditions. Because of his health problems, he frequently saw doctors in his home town of Libby, and at the Veterans’ Administration Hospital in Spokane, Washington.
¶38 He testified that he was told by W.R. Grace officials that the reason for their evaluation of him in 1983 was that there was asbestos in the dust where he had been employed, but that they did not explain to him that the asbestos was harmful. He knew of no co-workers who *354 had respiratory problems while he worked at W.R. Grace. He first developed symptoms of shortness of breath in 1994. When he went to the VA hospital with complaints of difficulty breathing, he was advised that it was probably due to his heart.
¶39 Kaeding testified directly that he first became aware that he had asbestosis in 1996 following his examination by Dr. Whitehouse. Prior to then, he had no idea that he had asbestosis, nor that he had any lung condition consistent with asbestosis.
¶40 Kaeding did become aware of an abnormal chest x-ray in 1971, but was told that it was related to scarring from a former condition of tuberculosis. His medical records, over a period of nearly thirty years, show repeated references to abnormal chest film due to a former condition of tuberculosis.
¶41 Kaeding testified that in 1985 he did receive a letter from W.R. Grace explaining that his 1983 chest film showed signs of asbestos tracking. However, he was advised to consult with his family doctor. When he did so, he was told that there was nothing to worry about. Instead, his family physician attributed his respiratory condition to smoking and pneumonia.
¶42 Kaeding testified that prior to his 1996 examination by Dr. Whitehouse, he has no recollection of being advised by any physician or other health care provider that he had abnormal radiology studies as a result of possible asbestosis. The radiology studies of his chest were only discussed with him as they related to signs of former tuberculosis.
¶43 Kaeding testified that he did retain an attorney in 1990 or 1991 to investigate a possible claim against W.R. Grace for dust-related health problems. However, he did not specifically relate his problems to asbestos and was not advised differently following Dr. Whitehouse’s evaluation of his radiology studies.
¶44 Dr. Whitehouse has been a pulmonologist for thirty years and has examined about 200 people from Libby with asbestosis. He examined radiologic studies of Kaeding’s lungs in 1992 at the request of Kaeding’s attorney, and felt that they were consistent with asbestosis, but also had questions about prior tuberculosis and arrived at no diagnosis at that time. He explained that he could not make a diagnosis of asbestosis without a clinical examination and that he did not see Kaeding personally until May 2, 1996.
¶45 Dr. Whitehouse testified that when he did evaluate Kaeding in 1996 he found pleural placquing and interstitial disease which is a *355 partial basis for his diagnosis of asbestosis, but explained that similar findings can result from a variety of diseases, including tuberculosis or empyema. Empyema is an infection in the chest which can result from either tuberculosis or bacteria, and is a significant illness. It is possibly for this reason that after reviewing Kaeding’s medical records he observed that no two health care providers had ever interpreted the chest films the same way, and that the condition that Dr. Whitehouse ultimately diagnosed was frequently referred to as something that it was not. He noted that some of the radiology reports in Kaeding’s medical records refer to the condition which he ultimately diagnosed as asbestosis as granulomatous disease, tuberculosis, or old empyema. He testified that some of the radiological abnormalities could have resulted from the thyroid toxicosis for which Kaeding had been treated.
¶46 However, in spite of the various explanations found in Kaeding’s medical records for abnormal x-ray film findings, there are also periodic reports in his VA records that his heart and lung examination was normal. These reports appear in 1988, 1992, and 1993.
¶47 In none of Kaeding’s medical records did Dr. Whitehouse find any indication that Kaeding himself related a history of asbestosis.
¶48 The majority thinks it is significant that Dr. Whitehouse reported radiological findings consistent with asbestosis to Kaeding’s attorney in 1992, and concludes that at least that information should have caused a reasonable person to inquire further about his health. However, even if it is assumed that that information was communicated to Kaeding (and he testified that it was not), he did have subsequent examinations, none of which confirmed cause for concern until his 1996 exam by Dr. Whitehouse. For example, on September 15, 1992, two weeks after Dr. Whitehouse’s letter, reports of radiology studies done at the VA hospital indicate that lung findings are suggestive of old tuberculosis and that there is no evidence of active pulmonary disease or cardiac failure. A February 9,1993, discharge summary from the same hospital indicated that Kaeding’s lungs were clear; and an April 1, 1993, report from the same hospital indicated that Kaeding had old tuberculosis and bilateral empyema, but made no mention of asbestosis. Finally, on January 19,1995, a radiology report from the VA hospital described Kaeding’s condition as “old inactive fibroid type of tuberculosis.”
¶49 Dr. Whitehouse testified that the vast majority of Kaeding’s x-ray film interpretations from 1973 to 1995 were incorrect. He fur *356 ther testified that in his experience, patients virtually never see their medical records. The only time his patient records have been requested is when someone sues him. He estimated that one-half of one percent of patients ever review their own medical records, regardless of who their health care provider is, and he saw no indication from any of Kaeding’s records that he had ever been informed that he had asbestosis before 1996; nor did he see any indication from the records that a proper diagnosis of asbestosis had ever been made before 1996. He explained that it is not unusual for health care providers who do not specialize in lung disease to miss a diagnosis of asbestosis, and explained that even radiologists miss the signs for the condition more than half the time. He also explained that his 1992 observation of signs consistent with asbestosis is entirely different than a diagnosis of asbestosis.
¶50 In light of Kaeding’s prolonged and complicated health history, the frequently incorrect information with which he was provided, and the contradictory findings that pervaded his medical records, it is impossible to conclude, as the majority does, that as a matter of law Kaeding knew or should have known before 1996 that he had asbestosis.
¶51 The majority suggests that this case is distinguishable from Hando v. PPG Industries, Inc. (1989), 236 Mont. 493, 771 P.2d 956, because in that case the plaintiff had not received medical information confirming her condition or its relation to her employment prior to 1984. To make that distinction, the majority has to assume that Kaeding’s condition was communicated to him prior to 1996. However, that assumption is contrary to both Kaeding’s direct testimony and Dr. Whitehouse’s conclusion from his review of Kaeding’s records. It was not the function of the District Court, and it is not the function of this Court to make those assumptions in deciding a motion for summary judgment. If anything, our decision in Hando and the uncontroverted testimony in this case would support summary judgment for Kaeding.
¶52 The majority opinion makes reference to entries in Kaeding’s medical records which suggest “the possibility of asbestosis,” signs “compatible with asbestosis,” and problems attributable “at least in part to asbestosis.” However, what the majority fails to point out is that subsequent to each of these entries, Kaeding was again examined with contradictory findings, such as “scarring from old TB,” “emphysema from history of smoking and working at W.R. Grace,” “old empyema,” and respiratory problems “secondary to smoking and *357 pneumonia.” What difference does it make if medical records include reference to asbestosis (even assuming it had been communicated to him in spite of his direct testimony that it had not) when follow-up exams suggested something to the contrary?
¶53 The majority also observes that while Kaeding received no technical diagnosis of asbestosis, several doctors were of the opinion prior to 1994 that his problems were attributable, in part, to asbestosis. Apparently, the majority feels more qualified to draw those conclusions from a review of Kaeding’s medical records than was Dr. Whitehouse, who is the only physician to testify in this case and who testified that Kaeding’s medical records include no diagnosis of asbestosis prior to his, which was made in 1996.
¶54 Finally, the majority concludes that it is significant that in 1992 Dr. Whitehouse reported x-ray findings consistent with asbestosis. However, as pointed out, the majority totally ignores the fact that on at least four occasions subsequent to that report, Kaeding was examined again by health care providers who concluded that his chest exams were normal or that any abnormalities were attributable to conditions other than asbestosis.
¶5 5 The question in this case is when Kaeding knew, or by the exercise of reasonable diligence should have known, that he had a disabling condition known as asbestosis caused by his employment with W.R. Grace & Co. Based on Kaeding’s direct testimony, and the only medical testimony offered in this case, he did not know that fact until 1996. Furthermore, based on any reasonable inference from the inconsistent and contradictory findings in his medical records, it was reasonable for him to believe prior to 1996 that any symptoms he was experiencing or any abnormal finding from his x-ray films were attributable to something other than asbestosis. At best, there was contradictory evidence which it is the function of a jury, not this Court or the District Court, to resolve.
¶56 Summary judgment on a factual issue is an extreme remedy which should be reserved for those situations where the facts are not in dispute. No fair review of the record in this case could lead to that conclusion.
¶57 For these reasons I dissent from the majority opinion. I would reverse the judgment of the District Court and remand to the District Court for a trial to determine whether Donald Kaeding’s claim against W.R. Grace & Co. was barred by the statute of limitations.
JUSTICE HUNT joins in the foregoing dissenting opinion.